S01A0146. THOMAS v. THE STATE.
S01A0321. TABORN v. THE STATE.
(549 SE2d 359)

HINES, Justice.

Makeba Thomas and Michael Taborn appeal their convictions for malice murder, armed robbery, theft by taking a motor vehicle, and burglary in connection with the killing of Deidre Stewart. Collectively, Thomas and Taborn challenge the sufficiency of the evidence; the denial of severance; the refusal to suppress evidence seized from the murder scene and at the time of apprehension; the overruling of a *Batson* objection; the alleged improper injection of character into evidence; the admission of handwriting exemplars; the admission into evidence of certain statements by the victim; the court's instruction to the jury; and the effectiveness of trial counsel. Finding the challenges to be without merit, we affirm.[1]

The evidence construed in favor of the verdicts showed that in September 1995, the victim, Deidre Stewart, moved from a townhouse she was renting into an apartment. Thomas and Taborn learned of the vacant townhouse and offered to move in and take over the monthly payments. Stewart agreed to sublet the townhouse and Thomas and Taborn moved in. The couple did not make the rental payments, and they decided to sell Stewart's furniture that was in

---

[1] The crimes occurred on October 5, 1995. On November 9, 1995, a Cobb County grand jury indicted Thomas and Taborn for malice murder, armed robbery, theft by taking a motor vehicle, and burglary. Thomas and Taborn were tried jointly before a jury November 11-21, 1996, and each was found guilty of all of the indicted charges. The jury also found each defendant guilty of felony murder while in the commission of armed robbery. On November 21, 1996, Thomas and Taborn were each sentenced to life imprisonment for malice murder; a consecutive term of life imprisonment for armed robbery; a consecutive term of 20 years in prison for theft by taking a motor vehicle; and a consecutive term of 20 years in prison for burglary. The felony murder verdicts stood vacated by operation of law. Thomas filed a motion for new trial on December 11, 1996, and an amended motion for new trial on May 10, 2000. Taborn filed a motion for new trial on December 6, 1996. The motions for new trial were denied in a joint order on August 4, 2000. Thomas filed a notice of appeal on August 31, 2000, her appeal was docketed in this Court on October 11, 2000, and the case was submitted for decision on December 4, 2000. Taborn filed a notice of appeal to the Court of Appeals on September 5, 2000, the Court of Appeals transferred the appeal to this Court on November 1, 2000, and the appeal was docketed in this Court on November 15, 2000. The case was submitted for decision on January 8, 2001.

the townhouse. On October 2, 1995, they enlisted the aid of a neighbor with a pickup truck, telling the neighbor that they were putting the furniture into storage. Instead the neighbor witnessed the sale of the entire truckload of furniture for about $45. Stewart's mail was still being delivered to the townhouse, and Thomas and Taborn were intercepting it. Stewart told friends that she was missing some checks which had been sent to her townhouse address. Thomas and Taborn knew that Stewart had an Acura Integra automobile and other property at her new apartment, and they wanted to get the property. They decided to lure Stewart to the townhouse and told Stewart that they were holding a registered letter for her. On October 4, 1995, Stewart and a friend went to the townhouse to retrieve the letter. Taborn told Stewart that her missing furniture was in storage and that the registered letter was with Thomas, who was not home. Stewart was upset and tried to find Thomas, but then gave up and went home.

The next day, October 5, 1995, Stewart returned to the townhouse alone. Taborn had placed wooden chair legs in locations throughout the townhouse so there would be ready access to a weapon when Stewart was there. Taborn struck Stewart in the head with a chair leg. Thomas or Taborn or both of them then stuffed a piece of cloth in Stewart's mouth, bound her ankles and her hands behind her back with shoelaces, and put a plastic grocery bag over Stewart's head, tying the bag around her neck with a strap from Thomas's swimsuit. They then stripped Stewart of her jewelry and other valuables, wrapped her body in a sheet, and put the body in the townhouse's backyard storage shed. The couple collected debris from the townhouse to cover the body.

Thomas and Taborn took Stewart's car and went to her apartment. They ransacked the apartment, and took a new color television and a small black and white one. They then went to a local pawn shop, and sold the televisions and a ring taken from Stewart's body. Thomas and Taborn returned to the townhouse, and then fled to Ohio in Stewart's Acura Integra.

Stewart was reported missing. On October 12, 1995, the police went to the townhouse. Several front windows were open, the front door was ajar, and there did not appear to be anything in the residence; the townhouse looked abandoned. As police approached the backyard storage shed, they noticed the odor of human decomposition emanating from the locked shed and found Stewart's bound and gagged body under a pile of trash and an old mattress. The appearance of the body was consistent with it having been in the shed for about seven days. The cause of Stewart's death was determined to be suffocation.

Once in Ohio, Thomas and Taborn attempted to burn some of

Stewart's possessions; they also stole a license plate and cashed one of Stewart's checks. Additionally, Taborn told a friend in Ohio that he had killed a woman; he confided in another friend that he had killed Deidre Stewart by hitting her with a table leg and placed her body in a shed. The pair then fled to Toronto, Canada. On October 16, 1995, they were approached by Canadian constables in Toronto after selling more of Stewart's jewelry. The constables, who worked the pawn/secondhand shops, became suspicious after observing the jewelry transaction. When asked about ownership of the Acura Integra, Thomas stated that they had traded a Ford Fiesta and $600 for it. Knowing that the vehicle was worth far more and noticing that the license plate was attached only with a single bolt, the constables ran a check of the license plate and vehicle identification number. Thomas and Taborn were placed under arrest for possession of stolen property.

While in Canadian custody, Thomas wrote a note to Taborn stating, "all this is my fault," and suggesting conditions of extradition, including that they not be separated and "No Death Penalty."

1. The evidence, although largely circumstantial, was sufficient to enable a rational trier of fact to find both Thomas and Taborn guilty beyond a reasonable doubt of the malice murder of Deidre Stewart and the related crimes. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). Viewed in the light most favorable to the verdicts, the jury was authorized to find that every reasonable hypothesis except Thomas's and Taborn's guilt was excluded. *Foster v. State*, 273 Ga. 34, 35 (1) (537 SE2d 659) (2000).

2. Thomas fails in the contention that the trial court erred in denying her motion to sever.

Thomas had the "burden of making a clear showing of prejudice and a denial of due process in the absence of severance." *Butler v. State*, 270 Ga. 441, 446 (4) (511 SE2d 180) (1999). The trial court has discretion in determining whether severance is necessary and that determination will not be set aside unless there is an abuse of that discretion. *Gee v. State*, 261 Ga. 178, 179 (3) (402 SE2d 719) (1991).

In this case, the trial court did not abuse its discretion by denying Thomas's severance motion. In considering severance, the court should consider

> whether the number of defendants will create confusion of the evidence and the law applicable to each individual defendant, whether there is a danger that evidence admissible against one defendant will be considered against another despite the cautionary instructions of the court, and whether the defenses of the defendants are antagonistic to each other or each other's rights.

*Butler v. State*, supra at 446 (4). Here, these factors militate against severance. The number of defendants would not create confusion of evidence and law, the law applicable to each defendant was substantially the same, and Thomas has not shown that the presentation of the evidence confused the jury. *Smith v. State*, 267 Ga. 372, 373 (2) (477 SE2d 827) (1996). Thomas has also failed to show that her defense was antagonistic to Taborn's. *Holmes v. State*, 272 Ga. 517, 518 (2) (529 SE2d 879) (2000). In fact, the gravamen of both defenses was that the State's case was insufficient because it was purely circumstantial. Finally, Thomas has not shown any prejudice to her case that might have been avoided by severance. *Isaac v. State*, 269 Ga. 875, 879 (7) (505 SE2d 480) (1998).

Thomas's reliance on *Price v. State*, 155 Ga. App. 844 (273 SE2d 225) (1980) is misplaced. In *Price*, "the evidence against one codefendant was deemed to be so overwhelming and the evidence against the other so slight that the 'spillover' effect of the evidence against the former was viewed as an important factor in the latter's conviction." *Saleem v. State*, 169 Ga. App. 952, 954 (2) (315 SE2d 487) (1984). In this case, the evidence against Taborn was indeed overwhelming, but the evidence against Thomas was equally compelling.

3. The trial court did not err in denying Thomas's motion to suppress evidence seized from the victim's townhouse. "[R]ights such as those conferred by the Fourth Amendment are personal in nature, and cannot bestow vicarious protection on those who do not have a reasonable expectation of privacy in the place to be searched." *Brown v. State*, 240 Ga. App. 321, 323 (1) (523 SE2d 333) (1999), quoting *Steagald v. United States*, 451 U. S. 204, 221 (101 SC 1642, 68 LE2d 38) (1981). The landlord testified that permission had never been given to sublet the townhouse, and that he had ordered Thomas and Taborn to vacate the premises, because they were trespassing, more than two weeks prior to the first search. When an individual has no ownership or possessory interest in the premises, the individual has no expectation of privacy, and therefore, lacks standing to challenge the validity of a search. *Brown v. State*, supra at footnote 2; *Moody v. State*, 232 Ga. App. 499, 504 (4) (a) (502 SE2d 323) (1998). Even assuming that prior to the searches at issue Thomas had been lawfully at the townhouse, the evidence was that the townhouse was abandoned by the time of the initial search; therefore, Thomas had no expectation of privacy at the time of the searches, and thus, no basis to complain of the searches and any evidence seized as a result. *Buttrum v. State*, 249 Ga. 652, 653 (2) (293 SE2d 334) (1982).

4. Nor did the trial court err in denying Thomas's attempt to suppress evidence obtained as a result of her stop and arrest by Canadian authorities.

Thomas argues that the arresting constable did not have reason-

able suspicion to detain her as required under *Terry v. Ohio*, 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968), that her case is similar to *Hughes v. State*, 269 Ga. 258 (497 SE2d 790) (1998), in that it also involved detention based on pattern evidence, and that assuming the constable did have reasonable suspicion to initially detain her, the length and nature of the stop exceeded the scope allowed for a *Terry* stop.

But "[t]he Fourth Amendment is generally inapplicable to actions carried out by foreign officials in their own countries enforcing their own laws, even if American officials are present and cooperate in some degree." *United States v. Behety*, 32 F3d 503, 510 (c) (11th Cir. 1994), citing *United States v. Rosenthal*, 793 F2d 1214, 1231 (11th Cir. 1986), cert. denied, 480 U. S. 919 (107 SC 1377, 94 LE2d 692) (1987); *Government of Canal Zone v. Sierra*, 594 F2d 60, 72 (5th Cir. 1979). Therefore, in general, evidence obtained by foreign police officials as the result of searches conducted in their country is admissible regardless of whether the search complied with the Fourth Amendment. *United States v. Behety* at 510 (c). However, the federal courts have recognized two exceptions to the general rule: (1) when the foreign officials' conduct during the search and seizure shocks the judicial conscience, and (2) when United States law enforcement officials substantially participate in the search or if the foreign officials were actually acting as agents for their American counterparts. Id. Neither exception applies in this case.

The constables involved in the stop testified that they did not know of the outstanding warrants at the time they stopped Thomas and Taborn. They were not working with any United States governmental agency, but rather in their capacity as officers with the metropolitan Toronto Police Service. Additionally, the reason they arrested Thomas and Taborn was because the Ohio license plate on the car had been reported stolen. As to the question of whether conduct is so outrageous as to shock the conscience of the judiciary, there is no evidence of such treatment in this case. In fact, the testimony regarding the conduct of the constables shows that their conduct did not run afoul of *Terry v. Ohio*.

Additionally, Thomas cannot assert a violation of her Fourth Amendment rights by the search of the victim's car because she had no proprietary interest in it nor a legitimate expectation of privacy in the vehicle or its contents. *Burgeson v. State*, 267 Ga. 102, 105 (b) (475 SE2d 580) (1996). In fact, because Thomas was knowingly using a stolen vehicle on a public road, she was in constant expectation of intrusion by authorities. Id. at 106 (b); *Brisbane v. State*, 233 Ga. 339, 344 (211 SE2d 294) (1974).

5. Taborn fails in his contention that the trial court erred in overruling his objection under *Batson v. Kentucky*, 476 U. S. 79 (106 SC

1712, 90 LE2d 69) (1986), to the State's strike of an African-American venireman.

The evaluation of a *Batson* challenge involves a three-step process: (1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven discriminatory intent. *Chandler v. State*, 266 Ga. 509, 510 (2) (467 SE2d 562) (1996).

Here, the State used one peremptory strike against an African-American venireman and the defense struck the only other African-American member of the venire. The trial court did not rule on whether Taborn established a prima facie case, but the State's explanation rendered such a showing moot. *Barnes v. State*, 269 Ga. 345, 349 (6) (496 SE2d 674) (1998).

The State explained that it was striking the venireman in question because he said that he had a prior unpleasant experience with the City of Marietta police when his son was hit by a patrol car. Contrary to Taborn's assertion, the State's articulated reason for striking the man was not implausible leading to the conclusion that it was pretextual. It was sufficiently race-neutral because the explanation was not based on a characteristic or stereotype peculiar to any race. *Turner v. State*, 267 Ga. 149, 152 (2) (476 SE2d 252) (1996). Rather, it was based on the personal experience of the venireman in question.

6. Taborn also fails in his claim that the State was allowed to improperly place his character and that of Thomas into evidence. See OCGA § 24-9-20 (b). He argues that in the opening statement, the prosecutor referred to Thomas as an exotic dancer and then elicited questions about her employment to "dirty up" the defendants based on stereotypes about exotic dancers. He also complains of evidence of a police videotape of the crime scene, showing a magazine with a photograph of a naked man on the cover, as a further attempt to show the bad character of the defendants.

Assuming that Taborn has standing to challenge references to Thomas's employment, he fails to show error. In the opening statement, the State can tell the jury what evidence it expects to present. *Clark v. State*, 271 Ga. 6, 8 (2) (515 SE2d 155) (1999). Here, the State's reference in the opening statement to Thomas's employment was followed with testimony about that employment, which was relevant to the question of Thomas's and/or the couple's need for money, and therefore, the apparent motive for the crimes. The State is authorized to present evidence of motive. Id. at 9 (4); *Johnson v. State*, 260 Ga. 457, 458 (2) (396 SE2d 888) (1990). This is so even if such evidence directly involves a defendant's participation in a group or activity that might be deemed "unsavory." *Clark v. State* at 9 (4).

Relevant evidence is not inadmissible because it may incidentally place a defendant's character in issue. *Allen v. State*, 272 Ga. 513, 515 (4) (530 SE2d 186) (2000); *Davis v. State*, 272 Ga. 327, 329 (2) (528 SE2d 800) (2000).

As to Taborn's contention of error in admission of the portion of the police videotape depicting the magazine in question, "[v]ideotapes, like still photographs, are admissible when relevant to an issue, even if inflammatory." *Ray v. State*, 266 Ga. 896, 897 (1) (471 SE2d 887) (1996). Here, the videotape showed the crime scene, and even if the shot of the magazine can be viewed as incidentally placing the defendants' character in issue, it cannot be concluded that it was so inflammatory as to deny either Taborn or Thomas a fair trial. *McGee v. State*, 267 Ga. 560, 566 (4) (480 SE2d 577) (1997).

7. There is no merit to Taborn's contention that the trial court allowed improper handwriting exemplars in violation of the State Constitution when it admitted into evidence a booking fingerprint card which he was forced to sign without being given any *Miranda* warnings. Taborn's allegation that he was forced to sign the fingerprint card is not supported by the record. While a defendant cannot be compelled to produce a handwriting exemplar, it is not error for the State to use as a handwriting exemplar, a voluntary writing by the defendant. *Ward v. State*, 262 Ga. 293, 298 (8) (417 SE2d 130) (1992). What is more, routine collection of a suspect's signature on a fingerprint card while booking the suspect into jail, even in the absence of *Miranda* warnings, does not constitute compelled self-incrimination in violation of the State Constitution. *Hudson v. State*, 188 Ga. App. 684 (1) (374 SE2d 212) (1988).

8. Thomas and Taborn contend that the trial court erred in allowing, under the necessity exception to hearsay, the testimony of four individuals, Elizabeth Stewart, Mary Jane Berrien, Yvonne Layer, and Riyad Nabaa, about statements made by the victim regarding the subletting of the townhouse and the problems she was having about retrieving her mail and the missing furniture and checks. For a statement to be admitted under OCGA § 24-3-1 (b), there must be particularized guarantees of trustworthiness. *Abraha v. State*, 271 Ga. 309, 313 (2) (518 SE2d 894) (1999). In other words, there must be something present which the law considers a substitute for the oath and cross-examination of the declarant. *White v. State*, 268 Ga. 28, 29 (2) (486 SE2d 338) (1997). Thomas and Taborn urge that this was lacking.

However, the circumstances which demonstrate the reliability of hearsay statements will vary depending on the nature of the statement, and therefore, the determination of trustworthiness is "inescapably subjective." *Gissendaner v. State*, 272 Ga. 704, 711 (6) (532 SE2d 677) (2000). Consequently, the trial court's determination will

not be disturbed absent an abuse of the court's discretion. Id.

The trial court did not abuse its discretion in allowing the statements made to the victim's mother, Elizabeth Stewart. The evidence showed that the victim was very close to both of her parents, that she trusted and confided in her mother and routinely sought her advice. In fact, she spoke by telephone with her mother almost daily, including the day before her murder. The victim had no reason to lie to her mother, nor were her statements contradicted in any manner. "Uncontradicted statements made to one in whom the deceased declarant placed great confidence and to whom she turned for help with her problems are admissible under the necessity exception." *Ward v. State*, 271 Ga. 648, 650 (2) (520 SE2d 205) (1999).

For these same reasons, the court did not abuse its discretion in admitting the testimony of Mary Jane Berrien. The evidence showed that the victim thought of and interacted with Berrien as if she were a surrogate mother. She trusted and confided in Berrien and sought her advice. She even lived with Berrien temporarily and took care of Berrien's children. Id. Here again there was no indication that the victim had reason to lie to Berrien about Thomas and Taborn. Moreover, Berrien's recounting of comments about subletting the townhouse were merely neutral statements of fact and the relating of the victim's statements concerning her missing checks was corroborated by evidence that Thomas and Taborn had been in possession of one of the victim's state benefit checks.

As to the testimony of Layer, the assistant manager at the victim's apartment complex, here again there was evidence of a confidential relationship with the victim. Although the two had known each other only a short period of time, they had become close friends. They discussed the victim's personal matters and gave each other advice. The victim even trusted Layer to accept delivery of a new television set. Id. In regard to Nabaa, the trustworthiness lies in the circumstances in which the statements were made. Nabaa was the friend who accompanied the victim to the townhouse the day before the murder. The victim had no reason to lie to her friend, and her comments were part of a spontaneous exchange explaining her conduct in leaving the townhouse. *Hayes v. State*, 268 Ga. 809, 811 (3) (493 SE2d 169) (1997). Even if admission of the hearsay testimony of Layer and Nabaa was error, it would have to be deemed harmless, as the substance of the victim's statements was duplicated by other admissible evidence. *Fetty v. State*, 268 Ga. 365, 368 (4) (489 SE2d 813) (1997).

9. Taborn contends that the trial court's instruction on the recent possession of stolen goods was confusing and burden-shifting in that "the jury is being told that recent possession of stolen property may allow them to infer that the defendant is guilty of murder without

any proof whatsoever that the defendant actually committed the murder."[2] But the charge, which is the pattern instruction,[3] when read as a whole is not confusing. *Roberts v. State,* 267 Ga. 669, 675 (10) (b) (482 SE2d 245) (1997). See also *Turner v. State,* 272 Ga. 441, 442 (2) (531 SE2d 354) (2000). What is more, it, in no manner, absolves the State from its burden of proof with regard to the murder and the other crimes charged.[4] See *Shy v. State,* 220 Ga. App. 910, 911 (2) (470 SE2d 484) (1996).

10. Finally, Thomas contends that she was denied her constitutional right to effective assistance of counsel because her trial counsel failed to present or discuss any plea offers with her and failed to investigate the case, and consequently failed to present evidence of domestic violence between her and Taborn. However, the contention is unavailing because in order to prevail on her claim of ineffective assistance of counsel, Thomas must show that her attorney's performance was deficient and that the deficiency prejudiced her such that a reasonable probability exists that, but for counsel's errors, the outcome at trial would have been different. *Mobley v. State,* 271 Ga. 577 (523 SE2d 9) (1999), citing *Strickland v. Washington,* 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). This she cannot do.

Thomas cites *Lloyd v. State,* 258 Ga. 645 (373 SE2d 1) (1988), for the proposition that "[o]bjective professional standards dictate that a defendant, absent extenuating circumstances, is entitled to be told that an offer to plead guilty has been made and to be advised of the consequences of the choices confronting him." Id. at 648 (2) (a). However, Thomas cannot show either deficiency or prejudice because she fails to present evidence of the existence of an uncommunicated plea

---

[2] The court charged:
[I]f you should find beyond a reasonable doubt that the crimes of burglary, theft, and robbery, or any of such crimes, have been committed as charged in this indictment and certain personal property as set forth in this indictment was stolen as a result of such crime or crimes and if recently thereafter the defendants should be found in possession of the stolen property or any of the stolen property, that would be a circumstance along with all the other evidence from which you may infer guilt as to burglary, theft, and robbery as set forth in this indictment, if you see fit to do so, unless there should be from the evidence a reasonable explanation of the possession of such property consistent with the plea of innocence, which is a question solely for you, the jury, to determine.

[3] The charge can be found in the Council of Superior Court Judges of Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, Second Edition, p. 101 (1991).

[4] Taborn cites *Clark v. State,* 265 Ga. 243 (454 SE2d 492) (1995), as "a case of improper inference." *Clark* was critical of the "use of a deadly weapon charge" because the charge emphasized the use of a deadly weapon to infer the intent to kill; id. at 246 (3) (c), and in *Harris v. State,* 273 Ga. 608, 610 (2) (543 SE2d 716) (2001), this Court held that the giving of such a charge is error. The instruction at issue in this case expressly advises the jury that if the defendant should be found in the possession of any of the stolen property, that it would be but a circumstance, to be considered along with all of the other evidence, from which the jury might infer guilt.

offer,[5] or that if there had been an offer, she would have accepted it.

Nor can Thomas carry her burden with regard to her claim that trial counsel was remiss by not presenting evidence of domestic violence. Trial counsel testified that the decision not to present such evidence was a matter of trial strategy because Thomas would have had to testify, including about her alleged alibi which counsel deemed unreliable and incredible. *Billups v. State*, 272 Ga. 15, 16 (2) (b) (523 SE2d 873) (1999).

*Judgments affirmed. All the Justices concur.*

DECIDED JULY 16, 2001 —
RECONSIDERATION DENIED JULY 27, 2001.

*Case No. S01A0146*

*Gregory A. Hicks, James K. Luttrell*, for appellant.
*Patrick H. Head, District Attorney, Dana J. Norman, Maria B. Golick, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ruth M. Bebko, Assistant Attorney General*, for appellee.

*Case No. S01A0321*

*Carlton C. Carter*, for appellant.
*Patrick H. Head, District Attorney, Maria B. Golick, Jack E. Mallard, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ruth M. Bebko, Assistant Attorney General*, for appellee.

---

[5] At the motion for new trial hearing, trial counsel testified that there "probably" was a plea offer which he "probably" discussed with Thomas, but he could not recall with certainty.